VARRENE (VON GLAHN v.). See Case No. 16,994.

VASSAULT (MEEKS v.). See Case No. 9,393.

VASSE (BAKER v.). See Case No. 784.

## Case No. 16,893.

### VASSE v. COMEGYS et al.

### [4 Wash. C. C. 570.] [1]

Circuit Court, E. D. Pennsylvania. Oct. Term, 1825. [2]

BANKRUPTCY—PROPERTY PASSING TO ASSIGNEES— SPANISH SPOLIATION CLAIMS.

The defendant, an assignee under a commission of bankruptcy issued against the plaintiff, received from the treasury of the United States the sum now sued for, being so much money awarded by the commissioners under the treaty of the 22d of February, 1819 [8 Stat. 252], between Spain and the United States, for spoliations made and embraced in the provisions of that treaty, upon the property of the plaintiff,

---

[3] [Reported by Hon. John McLean, Circuit Justice.]

[1] [Originally published from the MSS. of the Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

[2] [Reversed in 1 Pet. (26 U. S.) 193.]

who obtained his certificate the 28th of May, 1802. *Held,* 1. That the award of the commissioners that the moneys should be paid to the assignees, is not binding on the plaintiff, or a bar to this action. 2. The claim on Spain was not assignable under the bankrupt law of the United States, and did not pass by the assignment to the defendant, and that the plaintiff is entitled to recover as for money received to his use.

[Cited in Dutilh v. Coursault, Case No. 4,206; Re Gallagher, Id. 5,192; Re McKenna, 9 Fed. 32.]

[Disapproved in Belcher v. Burnett, 126 Mass. 231. Cited in Kane v. Clough, 36 Mich. 439. Cited in brief in Maitland v. Newton. 3 Leigh (Va.) 716. Disapproved in Leonard v. Nye, 125 Mass. 458.]

The jury found a verdict for the plaintiff, subject to the opinion of the court upon the *facts stated in the following case agreed:* The counsel for the parties agree to the following case, which, if required by either, may be turned into a special verdict, subject to the opinion of the court. That the plaintiff, Ambrose Vasse, previously to the year 1802, was an underwriter on various vessels and cargoes, the property of citizens of the United States, which were captured and carried into ports of Spain and her dependencies, and abandonments were made thereof to the said Vasse by the owners, and he paid the losses arising therefrom prior to the year 1802. The said Ambrose Vasse became embarrassed in his affairs, and his creditors proceeded against him as a bankrupt, under the act of congress of the United States, for establishing an uniform system of bankruptcy throughout the United States. An assignment was made accordingly to Jacob Shoemaker, who is since deceased, and the defendants. Cornelius Comegys and Andrew Petit; who proceeded to take upon themselves the duties of assignees, and have continued to discharge the same. The certificate of discharge of the said Ambrose Vasse bears date the 28th of May, 1802. In the year 1824, the sum of $8846.14 was received by the defendants from the treasury of the United States, *being the sum awarded by the commissioners* sitting at Washington. under the treaty of amity, settlement, and limits between the United States of America. and his Catholic majesty the king of Spain, dated the 22d day of February, 1819, on account of the captures and losses aforesaid. On the 9th day of December, 1823, the said Ambrose Vasse filed a bill in equity in the circuit court of the District of Columbia, claiming the sum awarded by the commissioners. and a settlement of the accounts of the assignees. The said Ambrose Vasse made a return of his effects to the commissioners of bankruptcy, November 21, 1825. The claim upon Spain for spoliations was not in the schedule, but claims on France and Great Britain were.

WASHINGTON, Circuit Justice. Two questions have been raised in this case. The first is, whether the right of the plaintiff is concluded by the award of the commissioners acting under the treaty with Spain of the 22d of February, 1819; in pursuance of which award the money in dispute was paid over to the defendants. If not so concluded, then the second question is, did the claim of the plaintiff to the sum so awarded pass by the assignment of the commissioners to the assignees?

1. It is to be preliminarily observed, that the case does not state in whose favour the award of the commissioners was made, or who were the parties that presented themselves before the commissioners as the claimants of this money. All the court can know is, that the money was paid to the defendants by the treasury of the United States. The case stated is in strict conformity with the evidence given to the jury. But in the view which I shall take of this case, I deem it immaterial who were the claimants, or in whose favour the award or sentence was given, if given in favour of any particular person or persons. The treaty prescribed the duties and the jurisdiction of the board of commissioners, and of course it was essentially the guide of that tribunal, as it must be of this. I admit at once, that the decisions of that board upon every subject within the scope of its authority, and to the utmost extent of its jurisdiction, are binding and conclusive upon this and upon every other judicial body. It was constituted by a treaty, and its decisions are entitled to the same sanctity as those of tribunals constituted by the constitution, or by the ordinary acts of legislation; beyond this they can have no binding force. What then were the duties of those commissioners, and what the extent of their jurisdiction? By the eleventh section of the treaty, they are to receive, examine, and decide upon the amount and validity of all the claims which the United States had consented by the ninth article to renounce, as well on the part of the government as of citizens of the United States; these were: 1. Claims on account of prizes made by French privateers, and condemned by French consuls, within the jurisdiction of Spain. 2. Claims of citizens of the United States on the Spanish government, arising from the unlawful seizure at sea, and in the ports and territories of Spain, or her colonies. And lastly, claims, of which statements soliciting the interposition of the United States had been presented to the department of state, &c. since the date of the convention of 1802. &c. The extent then of the jurisdiction of this board, was to decide upon the amount and validity of the claims which might be presented to it, on account of the enumerated losses and injuries. It had no cognizance of any other claims; and their inquiries and decisions were strictly confined to the validity and amount of such as they had cognizance of. They had no authority to decide, and we presume, that, in no instance did they decide, upon the rights of conflicting claims, or of hostile claimants. They did not possess the ordinary means of

engaging in investigations of that nature; nor was it consistent with the objects of the treaty, or the interest of the claimants, that such questions should be litigated before a tribunal so constituted. It necessarily belongs to the ordinary tribunals of the country, to decide, who is entitled to the money thus awarded by the commissioners to be paid to the United States; because they alone possess the means of examining and settling the innumerable questions to which such controversies may give rise.

The case of Campbell v. Mullett, 2 Swanst. 551, which was much relied upon by the defendant's counsel; does not, in my apprehension, conflict, in the slightest degree, with these sentiments. The treaty of 1794 [8 Stat. 116] between the United States and Great Britain, gave to the commissioners the same jurisdiction as that bestowed by the treaty under consideration. They were to receive, examine, and decide upon the validity and amount of certain claims, and they decided in favour of the two partners, who were American citizens, and against the claim of the other partner, who was a French subject. But then the claimants were not hostile to each other. They did not severally claim the same subject, nor did the loss of the unsuccessful claimant add to the gain of the other two. The opinion of the court was, that the award of the commissioners in admitting two of the claims, and in disallowing the third, was conclusive; and most unquestionably it was so, because the validity, or invalidity of those claims, was one of the subjects over which they had jurisdiction. But even if the jurisdiction of the board of commissioners, in the present case, had extended to the decision of conflicting claims, it is by no means to be admitted that their award would be conclusive in this suit; unless it appeared that the plaintiff was before the commissioners to submit his claim to their examination and decision. For although the decision of the board in favour of the assignees, the defendants, would be so far conclusive as to protect the treasury of the United States against a double payment; yet, if the money ought, in point of law, to have been paid, not to the assignees, but to the plaintiff, it was so much money received by the former to the use of the latter, and would be recoverable in this form of action. The principle here laid down was decided by this court at the last term, in the case of Mayer v. Foulkrod [Case No. 9,341].

2. The next, and the most important question is, did the claim of the plaintiff to the sum in controversy pass by the assignment of the commissioners to the assignees? A multitude of decided cases were referred to by the counsel on each side, but it has not been thought necessary by the court particularly to examine, as I am of opinion, that the solution of the proposed question must essentially rest upon the true construction of the bankrupt law of the United States; the

spirit and policy of which, to be collected from the various enactments, will be found to differ in many respects from those of the British bankrupt system. By the fifth section of the bankrupt law of the United States [of 1800 (2 Stat. 19)] the commissioners are to take possession of all the real and personal estate of every nature to which the bankrupt may be entitled in law or equity, in any manner whatsoever, and are to cause the same to be inventoried and appraised, and are also to take possession of all deeds, books of account, papers and writings belonging to the bankrupt. The next section directs the commissioners to assign and deliver over all the bankrupt's estate and effects aforesaid, with all the evidences and muniments thereof. The thirteenth section authorises the commissioners to assign all the debts due to the bankrupt, or to any other person for his benefit; which shall vest the property and right thereof in the assignees, as fully as if such bond, judgment, contract, or claim, had originally belonged, or been made to the assignees. The fourteenth section provides a mode by which the commissioners may discover any property, goods, chattels, or debts of the bankrupt, in possession of any other person than the bankrupt, or which are due to him. These are all the sections which relate to the assignment of the bankrupt's property by the commissioners, and to the subjects on which it is to operate; and we find that those are described to be, estates, real and personal, to which the bankrupt is entitled in law or equity; muniments of title, debts, property, effects, goods and chattels; the commissioners have no authority to assign any thing which cannot fairly be classed under one of these heads. But can a contingent interest, a mere possibility, be said, with any propriety, or with the slightest intention to the technical meaning of the term, to form a part of the estate, of the effects, the goods and chattels, the property or the debts of the bankrupt? Most clearly it cannot: it is not assignable by the bankrupt himself; and how then can it pass under the general assignment of the commissioners? The bankrupt does not pass it, nor can any other person pass it for his benefit. He has no present or certain future interest in it, no claim to it, and no means to obtain it; the thing may exist, and be the subject of property, but a right to it, or even a claim of right, does not. But the eighteenth section of the bankrupt law has been strongly pressed upon the court by the defendant's counsel, for the purpose of showing, that possibilities do pass by the assignment of the commissioners; this section declares, that, "if the bankrupt shall not within a certain period, surrender himself, &c. and make a full examination, disclose all his real estate, real and personal, and &c. on what consideration held of, and his interest of any part thereof, his goods, wares, merchandise, moneys, or

effects and estate, and of all books, papers and writings relating thereto, of which he was possessed, or to which he was entitled, or interested in, or held in trust for him, at any time before, or after issuing the commission, or whereby such bankrupt or his family then hath, or may have, or expect any profit, possibility of profit, benefit or advantage whatever, and shall not upon such examination execute in due form of law such conveyance, assurance, and assignment of his estate whatsoever and wheresoever, as shall be directed by the commissioners to vest the same in the assignees in trust for his creditors, and deliver up to the commissioners all such of his goods, wares, merchandise, money, effects, and estate, and all books, papers, and writings relating thereto in his possession, or power, &c. he shall, upon conviction of any wilful default, be adjudged a fraudulent bankrupt. It is very obvious that this section makes no provision in relation to the assignment by the commissioners; that subject having been fully disposed of by the preceding enactments. This section had manifestly two objects in view. The first was to compel the bankrupt to make a full discovery of all his property, in possession or in expectancy, and even of contingent interest and possibilities; since they would belong to his creditors, and be legally assignable by the commissioners under the fiftieth section, in case the contingency should happen, or the right otherwise vest in the bankrupt before the certificate was granted and allowed. But unless this discovery were made by the only person, perhaps, competent to make it, the creditors might be defrauded of their right to property standing in this predicament, and which might vest prior to the certificate, but unknown to the commissioners. The second object of this section was to compel the bankrupt himself to make such conveyances and assignments as the commissioners might direct; but conveyances and assignments of what,—not of possibilities, contingent interests, and expectancies; for then, would they pass to the commissioners or assignees, although the estate should vest by the happening of the contingency subsequent to the certificate, contrary to the policy of the fiftieth section; but "of his estate whatsoever and wheresoever." He is also to deliver to the commissioners certain papers and writings: but of what description; not such as concern contingent interest and possibilities, but "such as relate to such of his goods, wares, merchandise, money, effects and estate as he may have in his power and possession." Thus, it appears, that whenever the assignment by the commissioners, or by the bankrupt, is spoken of, the subjects are estates, effects, interest, property, debts and the like; and it is only on reference to a discovery, that possibilities and contingent interests are included, the reason for which I have already endeavoured to explain. I am

aware that the first section of the statute of 5 Geo. II. c. 30 (from which the above eighteenth section of our bankrupt law was no doubt copied), has received a different construction by the judges of England, from that which I have considered the correct one. But Mr. Eden, in his late work on the English Bankrupt Laws, assigns a reason for this, which, whether a defensible one or not, does not apply to the bankrupt law of the United States. The broad and comprehensive expressions in the statute of Elizabeth, giving to the commissioners power "over all such interests in lands, &c. as the bankrupt may lawfully depart withal," are not to be found in our act, and it was for this reason, amongst others, that this court ventured, in the case of Krumbhaar v. Burt [Case No. 7,-944], to dissent from the authority of Higden v. Williamson, 3 P. Wms. 132, which was mainly founded upon that provision. So likewise, the declaration in the statute of James, and which is copied into the late consolidation act of 6 Geo. IV. c. 16, "that the act shall be construed beneficially for creditors," is omitted in the bankrupt act of the United States. In his observations upon the first section of the statute of 5 Geo. II. c. 30, Mr. Eden admits that this section vests no power in the commissioners over the bankrupt's property, and gives no direction as to what they are to assign, but merely inflicts a penalty on the bankrupt for not disclosing his effects; and that the expressions used in it, "whereby he may expect any profit, possibility of profit, benefit or advantage whatever," go no further than to furnish an argument, by implication, of the intent of the legislature, in those provisions which respect the assignment by the commissioners. It is further the opinion of this learned author, that notwithstanding the above expressions are omitted in the late statute, passed in the present reign; still, from the general tenor and purport of the bankrupt act, from the provisions before mentioned, copied from the statute of James, and from the extensive words by which the powers are given to the commissioner to deal with and assign the bankrupt's property, the construction of the statute would be as extensive as if those expressions had been retained.

I have referred more fully to the sentiments of this writer than the subject may seem to have required, for the purpose of showing that the American courts ought to follow the decisions of those of England with great caution, in the construction of an act differing in so many essential particulars from the statute on which those decisions have been founded. I can find no encouragement in the act of the United States to give it a construction so liberal as to extend the power of the commissioners to the assignment of possibilities. But what is this which the defendants' counsel contend passed under the general assignment of the commissioners to the assignees? It is even less

than a possibility, because, in the latter, there is a contingent interest, which, upon the happening of a certain event, may become real and indefeasible in the claimant, which will be protected by all those legal sanctions which give stability and value to property. If we were to give a name to the former, I should call it a mere expectancy; but an expectancy without hope, because without right; even a contingent one, and without contract or obligation to support, and without a remedy, upon any known event, to enforce it. It depends upon the mere pleasure of an independent government which acknowledges no law but its own will, and which sets at defiance all remedy but that of force; the result of which can be known only to the great Omnipotent. By the illegal capture, and the carrying infra præsidia of the property insured by the plaintiff, or by the consular condemnations in Spain, the property was de facto lost to the owners; although these acts would not have been sufficient in the courts of England or of the United States, to falsify a warranty of neutrality. What then did the owners, or the underwriters obtain under the treaty? Not restitution; not damages in nature of compensation for the illegal captures complained of, for these claims could be made only against the captors; and yet it must be admitted that none such could be maintained in the ordinary tribunals either of Spain or of the United States. It would be going quite too far, in my opinion, to designate the claims for which this treaty provides compensation, by the name of contingent interests. Their discharge is nothing more than donations bestowed upon the injured parties from a sense of justice, or from considerations of state policy, by the voluntary grant of a sovereign power, and paid out of the national treasury to the claimant. The compensation thus bestowed is a new acquisition, and by no means the satisfaction of a pre-existing right, or binding obligation. That Spain was under an obligation to discharge those claims, is unquestionable; and it is equally so, that a parent is under an obligation to provide for his offspring. But these are both imperfect obligations, which vest in those who would claim their performance no transmissible interest or property whatever. Nay further, the hope of succession of an heir apparent (and how more like a certain interest is that than the present?) will not pass to the assignees, even in England, unless the estate should vest before the certificate is allowed. Carleton v. Leighton, 3 Mer. 671.

My opinion, in short is, that upon the true construction of the bankrupt law of the United States, possibilities did not pass under the assignment of the commissioners, and that the claim under consideration is not one of those possibilities which would pass to the assignees under the most liberal construction of the English bankrupt laws; con-

sequently, that the plaintiff is entitled to judgment.

This case was removed by writ of error to the supreme court, and the judgment of the circuit court was reversed. 1 Pet. [26 U. S.] 193.

[See Cases Nos. 16,894 and 16,895.]

As to assignments under the bankrupt law, see 2 Maule & S. 165; 2 Prest. Abst. 95; Sugd. Powers, 187; 17 Ves. 388, 460; 3 Barn. & Ald. 557.