## Case No. 4,206.

### DUTILH v. COURSAULT.

[5 Cranch, C. C. 349.] [1]

Circuit Court, District of Columbia. Nov. Term, 1837.

CRANCH, Chief Judge (THRUSTON, Circuit Judge, absent), after stating the substance of the bill, answers, and evidence, delivered the opinion of the court:

It is remarkable that not one of the defendants pretends to have personal knowledge of any of the material facts charged in the bill; and that the conscience of none of them can be affected, unless it be Mr. Kane, in denying the interest of the plaintiff in the brig Triphena and cargo; consequently, neither the averments nor the denials of facts, contained in those answers, are evidence in the cause, (although responsive to the allegations of the bill,) except as to the fact that Mr. Carmichael is a creditor of the estate of Amable Coursault. The only effect of such answers is, to present an issue and put the plaintiff to the proof of his allegations. The most material fact denied by those answers, is the interest of the administrator of Stephen Dutilh in the brig and cargo, or in the sum awarded to Amable Coursault as indemnification for their loss. They deny also the agreement between the plaintiff and Gregoire Coursault, that the claim should be presented in the name of the said Gregoire. If these two facts are established, the plaintiff's right to the relief for which he asks will follow of course, unless he should be barred from that relief by his acquiescence in the oath taken by Gregoire Coursault, the administrator of Amable Coursault, on the 3d of January, 1833, in the affidavit annexed to the memorial received by the commissioners on the 30th of January in the same year. Or by reason of his having had a right to present his original claim to the commissioners, under the convention, and having failed so to present it. The evidence of Mr. Dutilh's interest in the net proceeds of the adventure to Tonningen, is very satisfactory; and the certificate of Mr. Gregoire Coursault, as administrator of the estate of Amable Coursault, on the 10th of January, 1833, at the foot of the account current of the latter with Mr. Stephen Dutilh, (marked B,) made after the claim was filed, is evidence that Mr. Dutilh, as against Gregoire Coursault, would be entitled to one half of the sum which should be awarded, and that Gregoire Coursault, as administrator of Amable Coursault, would become the trustee of the plaintiff for one half of the amount of the award, as soon as it should be received. Mr. Kane now stands in the place of Gregoire Coursault, and if he receives the amount of the award, he, also, will become trustee for the plaintiff in like manner; and, if he refuses to pay over one half of it to the plaintiff, the latter may have relief in equity, unless barred by some principle of law, or some rule in equity.

1. The first objection taken by the defendant's counsel to the plaintiff's right to relief in equity, is, that he had a clear legal remedy, which he was bound to pursue elsewhere; that is, he was entitled to be an original claimant under the convention, whether his title was legal or equitable; and, that this is admitted by his bill where he says, that at or about the time the said Gregoire as admin-

istrator filed and exhibited his said memorial and claim for said compensation as aforesaid, it was agreed between him and the plaintiff, that the claim should be prosecuted in the name of the said Gregoire, thus avoiding the expense and trouble of two memorials and sets of proof; and that the right of the plaintiff's testator should be admitted and recognized to the extent of the moiety of the same; and the plaintiff refers to the written acknowledgment of Gregoire Coursault at the foot of the account current marked B, and dated January 10, 1833, which speaks of the claim as already entered by him before the board of commissioners at Washington. The affidavit to the memorial is dated the 3d of January, 1833; and the commissioners on the 30th of January, 1833, so far acted upon the memorial, as to order it to be received; for, according to the rules of the board, no memorial could be received, unless it contained certain averments verified by affidavit. The argument is, that having had a right to be an original claimant before the commissioners, and not having exercised that right, he can have no remedy in equity. In considering the validity of this objection, it may be well to inquire, what was the nature of the plaintiff's interest at the time of the filing of the claim by Gregoire Coursault as administrator of Amable Coursault? It appears by the agreement of the 5th of October, 1809, between Amable Coursault and Stephen Dutilh, that Amable Coursault was the owner of the brig and cargo then bound to Tonningen, consigned by Amable Coursault, to his brother Gregoire Coursault, who went out as supercargo. Of course the register of the brig must have been in the name of Amable Coursault, as well as all the invoices and ship's papers, all showing the proprietary interest to be in him alone. It is also to be inferred from the same agreement of the 5th of October, 1809, that the whole adventure was to be directed and managed by Mr. Coursault. That he and his supercargo were to transact the whole business, and that Mr. Dutilh was to take one half of the risk, and to receive from Mr. Coursault, to whom the returns were to be made, one half of the net proceeds of the voyage out and home; the legal title and proprietary interest in the brig and cargo still remaining in Mr. Coursault. There is no evidence of any delivery of possession of the property to Mr. Dutilh, nor of any act of ownership by him. For the chance of receiving one half of the net proceeds of the expedition, he was willing to pay the cost of one half of the outfit. Mr. Coursault's title to the vessel and cargo was good against all the world. Even Mr. Dutilh himself could not touch it. His right was only a future and contingent right to one half of the net proceeds of the voyage. He could claim nothing until the voyage should be ended, and the proceeds received by Mr. Coursault. He had no legal

property in the brig and cargo. He could not, either alone or jointly with Mr. Coursault, maintain trespass, or trover, or detinue for the vessel and cargo, or any part of them. If he should bring either of those actions alone, the defendant would defeat him by showing the legal title in Mr. Coursault. If he should join with Mr. Coursault in bringing the suit, the defendant would also defeat them by denying the title of Mr. Dutilh. If Mr. Coursault had insured the vessel and cargo, and they had been lost by the perils of the sea, Mr. Dutilh could not have had direct recourse to the underwriters; he could only claim through Mr. Coursault, who upon receiving the money from them would be a trustee for Mr. Dutilh's moiety. Mr. Coursault alone had the right to represent the property in a foreign tribunal; and to him alone would the property have been restored, if restored at all; and if the vessel and cargo had been captured as prize of war, and he had been an enemy, and Mr. Dutilh a friend, Mr. Dutilh's contingent right to a moiety of the proceeds of the voyage would not, as we apprehend, have saved any portion of the property from condemnation. So when retribution is made for the property sequestered, it is to be made to the party who had the legal title, and who could give a legal and valid discharge. Mr. Coursault, being the only person who could represent the property in the French tribunals, was the only proper person who could represent it before the commissioners. The indemnification awarded, stands in the place of the net proceeds of the voyage; and Mr. Dutilh's right to the moiety does not accrue until the indemnity comes into the hands, or is ready to be paid into the hands of the administrator of Amable Coursault, who, if he receives it, becomes a trustee for Mr. Dutilh as to his moiety. In this view of the subject, I am by no means satisfied that Mr. Dutilh could have supported a claim for indemnity before the board of commissioners; nor that his competency to do so is so clear as to deprive him of his right to proceed in equity against his trustee. If he had filed a claim before the commissioners, it must have been either in the name of the administrator of Amable Coursault, or jointly with him, or in his own name, stating his future interest in the sum to be awarded; in either of which cases, the proofs must have been the same, except so far as related to his interest in the net proceeds of the voyage, or in the amount which should be awarded. In either case, the disclosure of his interest could not in any manner alter the nature of the claim, as between the United States and France, or in any manner affect its validity. All that the commissioners were to ascertain, was, whether it was such a claim as was provided for by the convention, namely, whether it was a bonâ fide claim by citizens of the United States upon the French government, for such spoliations as were provided for by the con-

vention of July 4, 1831. This being ascertained, the commissioners were not bound to ascertain the rights of, and decide the litigations between conflicting claimants, citizens of the United States. They might select that one whom they deemed best entitled, and award to him the portion of the indemnity applicable to the claim, and leave the others to settle their disputes before the ordinary tribunals of the country, adjudicating according to the municipal laws of the land. If Mr. Dutilh had filed an original claim, the commissioners might have said to him, "Mr. Coursault has exhibited to us a clear legal title to the whole of the property; all the documentary evidence is in his name. You have suffered the voyage to be prosecuted entirely in his name; you admit his legal title; you are both citizens of the United States. It is a clear and valid claim under the convention, whether it belongs to one or the other, or to both jointly. We have no jurisdiction to decide between you. We shall be safe in awarding the indemnity to him who has the legal title, and we leave you to settle your conflicting claims in the ordinary courts of the country." This might have been the result if Mr. Dutilh had filed an original claim before the commissioners, and after he had been at the trouble and expense of filing a memorial and prosecuting the claim; whereas his object would be just as well accomplished by obtaining Mr. Gregoire Coursault's admission of his right to a moiety of whatever sum the commissioners might award. But whether Mr. Dutilh could or could not have supported an original claim before the board of commissioners, we deem a question of little importance, because the right of the commissioners to award the whole to Mr. Coursault is unquestionable, leaving all other citizens of the United States, having a right to participate in the amount thus awarded, to their remedy against Mr. Coursault, in the ordinary courts of justice. And the commissioners had no power to deprive them of that remedy. Admitting that Mr. Dutilh might have made and supported a separate and original claim before the commissioners, he was not bound to do so. His omission has no effect whatever upon the other claimants; nor upon the interests of the United States, or of France. His claim would not have been a claim at law, nor would his remedy have been a remedy at law as contradistinguished from equity, so as to be a bar to equitable relief.

The principle, that no decision of the board of commissioners under the French convention is conclusive between conflicting claimants, citizens of the United States, was decided by this court in the case of Ridgway v. Hays [Case No. 11,817], at November term, 1836. In the opinion of the court in that case, it is said: "It has been contended that the decision of the board of commissioners, rejecting the claim of Mr. Ridgway, is conclusive against him. To this there are two

objections. First, that the commissioners had no jurisdiction to decide ultimately between two or more conflicting American claimants." The act of congress of July 13, 1832 (4 Stat. 574), authorizing the appointment of the commissioners, declares their duties to be "to receive and examine all claims which may be presented to them under the convention," "and which are provided for by the said convention, according to the provisions of the same, and the principles of justice and equity and the law of nations:" "and to report to the secretary of state a list of the several awards made by them." It appears, by the first article of the convention, that the claims which the commissioners were to examine and report upon, were, "the reclamations preferred against it," (the French government,) "by citizens of the United States, for unlawful seizures, captures, sequestrations, confiscations, or destructions of their vessels, cargoes, or other property." "The claims, of which the board had cognizance, were claims against the French government; not against the owners of the property claimed, nor against the property itself. In each case, the great question for them to decide was, whether the property of American citizens had been unlawfully seized, &c., by the French government. So far as it was necessary to decide the national character of the property seized, they had authority to ascertain the legal owner; but if all the conflicting claimants were citizens of the United States, there was no necessity of their deciding the question of ownership between them. They might select the name of the person who seemed to them to be the legal owner; or they might name all the conflicting claimants, and leave them to litigate their rights in the municipal courts of the country; or they might award in favor of 'the legal owners,' without naming them; as they did in several cases, as will appear by reference to the list of awards returned by them to the secretary of state. See the printed documents of the house of representatives, No. 117, of the first session of the 24th congress." This opinion is in accordance with that of the commissioners under the treaty with Spain, (commonly called the Florida Treaty,) as stated in the case of Sheppard v. Taylor, 5 Pet. [30 U. S.] 685, from their final report to the department of state on the 8th of June, 1824, where they say: "But in these and many other cases which occurred, the board, having ascertained the full amount of the loss, distributed this amount, so ascertained, amongst the different parties claiming it before them, and seeming to have a right to receive it, no matter in what character, without deciding, or believing itself possessed of the authority to decide, upon the merits of conflicting claims to the same subject. To whom, of right, the sum thus awarded, when paid, may belong, or for whom, how, or in what degree, the receiver ought to be regarded as a trustee of the sum received, were questions depending upon the municipal laws of the different states of the Union, the application of which to the facts existing in any case, the board did not feel itself authorized to make; and, therefore, abstained from instituting any inquiry as to the facts necessary to such a decision." It may be remarked, here, that the powers given to the commissioners under the Florida treaty, are broader than those given to the commissioners under the French convention. The words of the Florida treaty are: "To ascertain the full amount and validity of these claims, a commission, to consist of three commissioners, citizens of the United States, shall be appointed by the president, by and with the consent of the senate; which commission shall meet at the city of Washington, and within the space of three years from the time of their first meeting, shall receive, examine, and decide upon, the amount and validity of all the claims included within the description above-mentioned." "The said commissioners shall be authorized to hear and examine, on oath, every question relative to the said claims, and to receive all suitable authentic testimony concerning the same. And the Spanish government shall furnish all such documents and elucidations as may be in their possession for the adjustment of the said claims, according to the principles of justice, the laws of nations, and the stipulations of the treaty between the two parties, of the 27th of October, 1795; the said documents to be specified, when demanded, at the instance of the said commissioners." The act of congress, authorizing the appointment of these commissioners, neither adds to, nor diminishes their powers.

The French convention does not, like the Florida treaty, provide expressly for a board of commissioners, but only provides that the indemnity to be paid by the French government to the government of the United States, shall be distributed, by the latter, among those entitled, in the manner and according to the rules which it shall determine. By the sixth article, the two governments reciprocally engage to communicate to each other the documents, titles, and other information proper to facilitate the examination and liquidation of the reclamations comprised in the stipulations of that convention. The act of congress of the 13th of July, 1832, "to carry into effect the convention," authorizes the president, with the advice and consent of the senate, to appoint "three commissioners, who shall form a board, whose duty it shall be to receive and examine all claims which may be presented to them under the convention," "which are provided for under the said convention, according to the provisions of the same, and the principles of justice, equity, and the law of nations." And by the second section of the act they are authorized to make "all needful rules and regulations," "for carrying their said commis-

sion into full and complete effect." And by the sixth section they are required to "report to the secretary of state a list of the several awards made by them." By a comparison of the powers of the respective boards it appears, that the commissioners under the Spanish treaty are authorized, not simply, as the other commissioners are, "to receive and examine" the claims, "according to the principles of justice, equity, and the law of nations," and send a list of their awards to the secretary of state; but "to receive, examine, and decide upon, not merely the claims, but the amount and validity of the claims; and further, "to hear and examine on oath, every question relative to the said claims, and to receive all suitable authentic testimony concerning the same," and "for the adjustment of the said claims according to the principles of justice, the law of nations, and the stipulations of the treaty" of 1795. Yet with all these powers, so far transcending those given to the commissioners under the French convention, the commissioners under the Florida treaty did not believe themselves "possessed of the authority to decide upon the merits of conflicting claims to the same subject." If their construction of their own authority was correct, a fortiori are we correct in denying the supposed power to the commissioners under the French convention?

But we are further fortified in our opinion respecting the powers of the commissioners under that convention by the opinion of the circuit court of the United States for the district of Pennsylvania, as delivered by the late Mr. Justice Washington in the case of Vasse v. Comegys [Case No. 16,893], and by the opinion of the supreme court of the United States, as delivered by Mr. Justice Story in the same cause. [Comegys v. Vasse] 1 Pet. [26 U. S.] 211, 212. In the circuit court, Mr. Justice Washington said: "It is to be preliminarily observed, that the case does not state in whose favor the award of the commissioners was made, or who were the parties that presented themselves before the commissioners as the claimants of this money. All the court can know is that the money was paid to the defendants by the treasury of the United States; but in the view which I shall take of this case, I deem it immaterial who were the claimants, or in whose favor the award, or sentence, was given, if given in favor of any particular person or persons. The treaty described the duties and the jurisdiction of the board of commissioners, and, of course, it was essentially the guide of that tribunal, as it must be of this. I admit, at once, that the decisions of that board, upon every subject within the scope of its authority, and to the utmost extent of its jurisdiction, are binding and conclusive upon this, and upon every other judicial body. It was constituted by a treaty, and its decisions are entitled to the same sanctity as those of tribunals constituted by the constitution or by the ordinary acts of legislation; beyond this they have no binding force. What, then, were the duties of those commissioners, and what the extent of their jurisdiction? By the eleventh section of the treaty they are to receive, examine, and decide upon the amount and the validity of all the claims which the United States had consented, by the ninth article, to renounce, as well on the part of the government as of citizens of the United States. The extent, then, of the jurisdiction of this board was to decide upon the amount and validity of the claims which might be presented to it on account of the enumerated losses and injuries. It had no cognizance of any other claims; and their inquiries and decisions were strictly confined to the validity and amount of such as they had cognizance of. They had no authority to decide, and we presume that in no instance did they decide, upon the rights of conflicting claims, or of hostile claimants. They did not possess the ordinary means for engaging in investigations of that nature; nor was it consistent with the objects of the treaty, or the interest of the claimants that such questions should be litigated before a tribunal so constituted. It necessarily belongs to the ordinary tribunals of the country to decide who is entitled to the money thus awarded by the commissioners to be paid to the United States because they alone possess the means of examining and settling the innumerable questions to which such controversies may give rise." "But even, if the jurisdiction of the board of commissioners, in the present case, had extended to the decision of conflicting claims, it is by no means admitted that their award would be conclusive in this suit; unless it appeared that the plaintiff was before the commissioners to submit his claim to their examination and decision. For, although the decision of the board in favor of the assignees, the defendants, would be so far conclusive as to protect the treasury of the United States against a double payment; yet if, in point of law, the money ought to have been paid, not to the assignees, but to the plaintiff, it was so much money received by the former to the use of the latter, and would be recoverable in this form of action." And in delivering the opinion of the supreme court of the United States in the same cause (1 Pet. [26 U. S.] 212), Mr. Justice Story says: "It has been justly remarked, in the opinion of the learned judge who decided this cause in the circuit court, that it does not appear, from the statement of facts, who were the persons who presented or litigated the claim before the board of commissioners; nor whether Vasse himself was before the board; nor who were the parties to whom, or for whose benefit the award was made. We do not think that the fact is material, upon the view which we take of the authority and duties of the commissioners. The object of the treaty was to invest the commissioners with full power and authority

to receive, examine, and decide upon the amount and validity of the asserted claims upon Spain for damages and injuries. Their decision, within the scope of this authority, is conclusive and final. If they pronounce the claim valid or invalid, if they ascertain the amount, their award in the premises is not re-examinable. The parties must abide by it as the decree of a competent tribunal of exclusive jurisdiction. A rejected claim cannot be brought again under review, in any judicial tribunal. An amount once fixed is the final ascertainment of the damages or injury. This is the obvious purport of the language of the treaty. But it does not necessarily or naturally follow that this authority, so delegated, includes the authority to adjust all conflicting rights of different citizens to this fund so awarded. The commissioners are to look to the original claim for damages or injuries against Spain itself, and it is wholly immaterial for this purpose, upon whom it may in the intermediate time have devolved; or who was the original legal, as contradistinguished from the equitable owner; provided he was an American citizen. If the claim was to be allowed as against Spain, the present ownership of it, whether in assignees, or personal representatives, or bona fide purchasers, was not necessary to be ascertained in order to exercise their functions in the fullest manner. Nor could they be presumed to possess the means of exercising such a broad jurisdiction with due justice and effect. They had no authority to compel parties asserting conflicting interests, to appear and litigate before them; nor to summon witnesses to establish or repel such interests; and under such circumstances it cannot be presumed that it was the intention of either government to clothe them with an authority so summary and conclusive, with means so little adapted to the attainment of the ends of a substantial justice. The validity and amount of the claim being once ascertained by the award, the fund might well be permitted to pass into the hands of any claimant; and his own rights, as well as those of all others who asserted a title to the fund, be left to the ordinary course of judicial proceedings in the established courts, where redress could be administered according to the nature and extent of the rights or equities of the parties. We are, therefore, of opinion that the award of the commissioners, in whatever form made, presents no bar to the action, if the plaintiff is entitled to the money awarded by the commissioners."

The principle upon which these opinions rest, was settled in England by Lord Chancellor Hardwicke, in the year 1748, in the case of Randal v. Cockran, 1 Ves. Sr. 98. "The king having granted letters of reprisal on the Spaniards, for the benefit of his subjects, in consideration of the losses they sustained by unjust captures, the commissioners would not suffer the insurers to make claim for part of the prizes, but the owners only, although they were already satisfied for their loss by the insurers, who thereupon brought the present bill." "Lord chancellor was of opinion that the plaintiff had the plainest equity that could be. The person originally sustaining the loss was the owner; but, after satisfaction made to him, the insurer. No doubt but from that time, as to the goods themselves, if restored in specie, or compensation made for them, the assured stands as a trustee for the insurer, in proportion for what he paid. Although the commissioners did right in avoiding being entangled in accounts, and in adjusting the proportion between them, their commission was limited in time. They see who was owner; nor was it material to them, to whom he assigned his interest, as it was, in effect, after satisfaction made." Here, although the commissioners had rejected the claim of the underwriters, the lord chancellor decided that their claim was good in equity; that the commissioners did right not to entangle themselves in the disputes between the owners and the underwriters, and in awarding in favor of the owner, whose original right to indemnity was unquestionable.

This court is further sustained in its opinion by that of Lord Chancellor Eldon in the case of Hill v. Reardon, 2 Russ. 608, which was a case under the treaty of —— between England and France, in which the commissioners had awarded the whole indemnity to one Devereux, under whom the defendant Reardon claimed. Hill and others brought their bill in equity against Reardon, who had received the amount awarded. The plaintiffs in equity had never presented their claim to the commissioners, although the facts upon which their claim rested were brought to the knowledge of the commissioners. Upon the hearing before the vice chancellor, in the year 1825, he decided that the award of the commissioners was final and conclusive against the plaintiffs, and dismissed their bill. Upon appeal to the lord chancellor, in 1827, he reversed the decision of the vice-chancellor upon that point, and said: "The first question is, whether an award made in favor of A. B. by the commissioners acting under the conventions between France and this country, is not only to be conclusive as between the subjects of this country and the French government, but is also to destroy all demands in equity which third persons might have against A. B. if he had received the money otherwise than through the channel of such award. My opinion is, that the conventions and act of parliament have no such effect." "The conventions and act of parliament, meant no more than this, that the decision of the commissioners should be conclusive between the two countries; and that the demand of an English subject, and a judgment in his favor, and a compliance with the judgment, would be a discharge of the government of France;

but the equities with which any persons receiving money under the adjudication of the commissioners might be affected, were not at all touched by the conventions and the act." The lord chancellor, however, being of opinion that the plaintiffs had not made out their equity, dismissed the bill; but without costs.

Thus supported, we still adhere to the opinion expressed by this court, in the case of Ridgway v. Hays [supra], and must say that the award of the whole indemnity to Mr. Coursault is no bar to Mr. Dutilh's remedy in equity against Mr. Coursault's administrator, if he has received the fund, or against any other person in whose hands it may be. This we think a sufficient answer to the defendant's first objection, that the plaintiff had a legal remedy by claim before the commissioners, which he ought to have pursued.

2. The second objection to the plaintiff's relief in equity is, that Mr. Coursault, in order to comply with a rule made by the board as a condition of their receiving his claim, on the 3d of January, 1833, in an affidavit annexed to his memorial, made oath that the facts, circumstances, and allegations stated in the said memorial, so far as they had come within his own knowledge, were true as stated, and that those stated as derived from the knowledge of others, he believed to be true. That the said memorial contains the following declaration, viz., "That no other person was at the time of the origin of this claim, nor has at any time since been, nor now is, interested in said claim, or any part thereof, except the said Amable Coursault, and your memorialist, his administrator, as hereinbefore stated; and that, whatever amount of said claim may be awarded under said convention, will belong solely and exclusively to your memorialist, as administrator of the said Amable Coursault, deceased." That the above declaration was false, as appears by the plaintiff's own statement in his bill, and that Gregoire Coursault, when he made the said affidavit, knew it to be false, as appears by his certificate, dated the 10th of January, 1833, written at the foot of the account current of Amable Coursault against Stephen Dutilh, in which he charges Mr. Dutilh with one half of the estimated value of the brig and outfit, and with one half of the cargo, and gives him credit for $1,099.80 for logwood, and for his three notes, amounting to $3,854.54 for the balance. In that certificate of the 10th of January, 1833, Mr. Gregoire Coursault says, "I do certify and declare, that to my knowledge the above is true, and that the estate of Mr. Stephen Dutilh, deceased, is interested of one half in the claim of the French, entered by me before the board of commissioners at Washington, for the whole amount of the brig Triphena and cargo." It seems, therefore, that the oath taken by Mr. Gregoire Coursault, on the 3d of January, 1833, must have been false. It is also contended,

that Mr. Dutilh, the present plaintiff, must have been conusant of that oath and assented to it, and must. therefore, be considered as a participator in his guilt, and must abide its consequences. That he is to be considered as particeps criminis. That no person can have a standing in a court of equity, whose claim rests upon an avowed violation of the law. And, to support this doctrine, the case of Cambioso v. Maffitt [Case No. 2,330] is cited. It was an issue sent by the commissioners of bankrupts to try the right of the executors of Cambioso to recover from the bankrupt a share of the net proceeds of sundry adventures carried on as joint owners, by Cambioso, an alien, and Maffitt, a citizen of the United States, in fraud of the revenue laws of the United States, Maffitt having obtained, in his own name, American registers for vessels owned jointly by him and Cambioso, thereby evading the payment of foreign duties; to obtain which registers, Maffitt must have taken a false oath. Mr. Justice Washington, in his charge to the jury in that case, said: "The defendants insist that this claim cannot be enforced in the courts of the United States, because those courts cannot lend their aid to establish a demand founded on a violation of the laws of the United States. This principle of law may not, in a moral point of view, destroy the right of the plaintiff; but it goes to defeat his remedy in the tribunals of this country. The soundness of the principle, as a general one, is acknowledged by the plaintiff's counsel; but it is contended to be inapplicable to foreigners, who are not bound to take notice of the revenue laws of a foreign country, unless proof is brought home to them of a knowledge of those laws, or of every fact necessary to apprise them of the breach of them." The judge, after giving his reasons at large for denying the supposed exception to the generality of the principle, said: "Upon the whole, then, it is clear, that if proof were necessary to be brought home to Cambioso, of his knowledge that these vessels had obtained the character of American vessels by a fraud upon the laws of the United States, such proof is furnished by the nature of the transactions themselves. But whether he had such knowledge in fact or not, the frauds were committed by his partner, or agent, by which he must be affected; and as to the revenue laws themselves, he was bound to take notice of them. As to any goods which may have been imported in those vessels into this country, which were free of duties, they are subject to a different consideration. Such importation was not a violation of the revenue laws. As Cambioso gained nothing, and the United States lost nothing, by a concealment of his interest in those goods, or in the vessels, there was no such fraud as would vitiate his demand for any balance due on their account. It was contended that Cambioso, by sending to Maffitt documents representing the cargoes as

belonging to Maffitt, enabled him to commit perjury in the oath which he took at entering them; and that thus participating in this immorality, he ought not to recover. But it by no means appears that the oath taken by Maffitt, on entering such goods as his sole property, was even false, much less, that it was perjury. We do not observe that the oath, or any part of the law, requires that all the partners should be named. The object of the law is to insure the payment of duties; and not to disclose the names of the owners of the property." "But even admit that a false oath was taken by Maffitt, by means of the papers sent to him; we do not see how this can affect the right of Cambioso to recover the value of these goods sold by Maffitt, for which he was justly indebted to Cambioso. Cambioso violated no law of the United States in concealing his name as part-owner of these goods."

Upon considering this Case of Cambioso, it is evident that the foundation of the principle upon which it was decided, is fraud. The plaintiff was not permitted to recover, because his claim was founded in fraud; not mere false swearing, from which no injury resulted or was intended. There was an actual fraud practised upon the United States by means of the false oath. An injury to the United States was intended and actually perpetrated. The United States, by that oath, had been cheated out of a large amount of revenue; and Cambioso was completely particeps criminis, to the extent of the fraud intended, as well as of that actually perpetrated. It is evident, also, that the principle applies only to cases of fraud. For if the false swearing alone was sufficient to prevent the plaintiff from recovering, the judge could not have said, in relation to the goods free of duties, imported in the same vessel respecting which the false and fraudulent oath was taken, that "there was no such fraud as would vitiate his demand for any balance due on their account." Nor could he have said, as he did, "But even admit that a false oath was taken by Maffitt, by means of the papers sent to him, we do not perceive how this can affect the right of Cambioso to recover the value of these goods sold by Maffitt, for which he was justly indebted to Cambioso. Cambioso violated no law of the United States in concealing his name as part-owner of these goods." And why did he not violate a law of the United States in concealing his name as part-owner of those goods? Because it was immaterial to the United States whether the goods belonged to an alien, or to a citizen of the United States; for in either case they paid the same rate of duties as if imported in a vessel of the United States. The rate depended upon the character of the vessel, not that of the owner of the goods. In order, therefore, to make this case like that of Cambioso and Maffitt, it must be shown that the claim of the plaintiff is founded in fraud. It must not only be

shown that a false oath was taken by Coursault, but that it was taken with intent to defraud the United States, or some person, and that the plaintiff was a participator in that fraud. So far, however, from there being any evidence of a fraudulent intent on the part of Mr. Coursault or of Mr. Dutilh, in filing the claim in the name of Mr. Coursault alone, without disclosing the interest of Mr. Dutilh, and in the oath taken by Mr. Coursault, it is clear that the rights of no person, nor of the United States, would in any manner have been varied, if Mr. Coursault, in filing the claim, had disclosed the interest of Mr. Dutilh; or if Mr. Dutilh had filed a separate claim for his half of the indemnity. As both were citizens of the United States, and as Mr. Dutilh was not indebted to the United States, no possible motive, affecting the United States, or the other claimants, can be imagined for concealing the interest of Mr. Dutilh. Whatever might have been the motive of Mr. Coursault in filing the claim in his own name and making the affidavit, there is no evidence that Mr. Dutilh participated in that motive; on the contrary, the presumption is that Mr. Coursault filed the claim in his own name alone without consulting Mr. Dutilh, and that Mr. Dutilh, hearing of the claim being thus filed on the 3d of July, applied to Mr. Coursault on the 10th to give him an acknowledgment of the interest of his testator's estate in the sum which should be awarded, which acknowledgment appears to have been readily given. There is no evidence upon which to charge Mr. Dutilh with bad faith towards the United States or the claimants under the convention, or with any evil intent or sinister design. The intention to save expense is not averred in the bill as the motive for suffering the claim to be filed by Mr. Coursault alone, but as a consequence of his thus filing it, and of Mr. Dutilh's subsequent assent upon receiving Mr. Coursault's acknowledgment that the estate of Mr. Stephen Dutilh was interested therein. The averment in the bill is not that they agreed that the claim should be filed in the name of Mr. Coursault alone, to save expense; but that it should be "prosecuted" in his name, "thereby avoiding the expense and trouble of two memorials and sets of proof." The oath was not required by the law which designates the duties and the authority of the commissioners, nor by the convention. It was required only by a rule of the commissioners, as a condition, without which they would not receive and act on any memorial. It is by no means clear of doubt, whether the commissioners had authority to make such a rule; for the second section of the act, which authorizes them to make rules, only authorizes them to make rules "not contravening the laws of the land, the provisions of this act, or the provisions of the said convention;" and in the first section of the act, it is expressly declared to be the duty of the board, "to receive and examine all claims which

may be presented to them under the convention, which are provided for by the convention, according to the provisions of the same." But, admitting that they had a right to require such an oath, and that the oath taken was false, there is no evidence that it was taken with such a fraudulent intent as brings the claim, even of Mr. Coursault, within the principle which denies relief in the courts of the United States either at law or in equity. Much less is there any evidence which will justify an imputation to Mr. Dutilh of whatever of obloquy may be supposed to attach to Mr. Coursault, or of any portion of it. He comes into this court with clean hands, and we think, has a right to relief in equity.

It was contended at the hearing, that as each claimant is interested in opposing all the others, so as to increase the fund, which is insufficient to pay all in full, all the other claimants should have been made parties in this cause. But it is clear, that as the award of the commissioners in favor of Gregoire Coursault is conclusive as to the amount and validity of the claim, this litigation between him or the creditors or his intestate, Amable Coursault, and Mr. Dutilh, can have no effect whatever upon the general fund to be divided among the claimants, and that a decree in this cause can have no effect whatever upon the interests of the other claimants.

We have not noticed the objection to Mr. Carmichael's right to interfere in the litigation between Mr. Dutilh and the administrator of Amable Coursault. He was not a necessary party in this controversy. He can claim no greater rights than those which Mr. Amable Coursault could have claimed, if he had been a party; nor than those which his administrator can now claim. Mr. Dutilh's right to one moiety of the indemnity is clearly proved; and if Amable Coursault himself were now before the Court and had received the money, he would be a trustee to Mr. Dutilh for that moiety; and his administrator, who is now a party, if he receives the money, will be equally a trustee of that moiety for Mr. Dutilh.

This being the opinion of the court upon the principal question in the cause, the counsel for the plaintiff will prepare the form of a decree for the consideration of the court.